# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

CECILIA YARBROUGH, o/b/o )
J.B.S., a minor, )
                                     )
             **Plaintiff,**      )
                                     )
                     **v.**              )     Case No. CIV-18-102-SPS
                                     )
**ANDREW M. SAUL,** )
**Commissioner of the Social** )
**Security Administration,** [1] )
                                     )
             **Defendant.**     )

## OPINION AND ORDER

The claimant Cecilia Yarbrough requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying benefits for her grandson J.B.S. under the Social Security Act. The claimant appeals the decision of the Commissioner and asserts that the Administrative Law Judge ("ALJ") erred in determining J.B.S. was not disabled. For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

### Social Security Law and Standard of Review

Disability for persons under the age of eighteen according to the Social Security Act is defined as a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations and that can be expected

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. Saul is substituted for Nancy A. Berryhill as the Defendant in this action.

to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. § 416.906. Social Security Regulations implement a three-step sequential process to evaluate a claim for Child's Supplemental Security Income Benefits under Title XVI of the Social Security Act.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[1] Step one requires claimant to establish he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 416.971-416.976. Step two requires claimant to establish he has an impairment or combination of impairments that is severe. If claimant is engaged in substantial gainful activity or is found not to have a medically determinable impairment or the impairment causes a slight abnormality or combination of slight abnormalities resulting in no more than minimal functional limitations, he is considered not disabled. At step three, claimant's impairment must meet, medically equal, or functionally equal the severity of an impairment in the listing of impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments that meet or medically equal the requirements of the listing or that functionally equal the listing and meet the duration requirement will be found disabled. See 20 C.F.R. § 416.924(a)-(d)(2).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Background and Procedural History**

J.B.S. was ten years old at the time of the administrative hearing (Tr. 36, 151). The claimant alleges J.B.S. was disabled as of February 1, 2012, due to attention deficit hyperactivity disorder ("ADHD"), explosive mood disorder, and depression (Tr. 45, 172). On June 30, 2015, the claimant filed an application for supplemental security income benefits under Title XVI (42 U.S.C. § 1381 *et seq.*) (Tr. 151-79). Her application was denied. ALJ Deirdre O. Dexter conducted an administrative hearing and determined that J.B.S. was not disabled in a written opinion dated March 31, 2017 (Tr. 12-30). The Appeals Council denied review, so the ALJ's findings represent the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made her decision at step three of the sequential evaluation. She determined J.B.S. had the severe impairments of depressive disorder, ADHD, and impulse control disorder, but that such impairments did not meet and were neither medically nor functionally equivalent to any of the relevant listings (Tr. 15-29). The ALJ thus concluded that J.B.S. was not disabled (Tr. 29-30).

**Review**

The claimant contends that the ALJ erred by failing to: (i) specifically analyze whether J.B.S. met or medically equaled Listing 112.05 for intellectual disorders, and (ii) consider all of the evidence in determining whether J.B.S. met or medically equaled

Listing 112.11 for neurodevelopment disorders and whether J.B.S.'s impairments were functionally equivalent to a listing. The Court finds these contentions unpersuasive.

The relevant medical evidence reveals that Dr. Eric Broadway regularly treated the claimant for ADHD from May 2013 through December 2016 (Tr. 319-67, 374-88, 419-21). Initial treatment notes reflect persistent hyperactivity, aggressive behavior, and/or difficulty focusing despite treatment, but by December 2014 J.B.S.'s concentration was good and there were no complaints about his behavior (Tr. 333-67). Thereafter, J.B.S. was consistently "doing well" with good concentration/focus and a good mood through August 2016 (Tr. 319-32, 374-87). At a follow-up appointment in December 2016, J.B.S.'s grandmother indicated he needed medication for depression and J.B.S. agreed that he was feeling depressed (Tr. 419).

In November 2014, Randy Randleman, Ph.D., performed a psychological consultative examination of J.B.S. (Tr. 305-16). He observed that J.B.S. approached the session in a quiet and reserved manner, was suspicious but cooperative, was often fidgety, worked slowly through the tasks, and wanted to give up on most items when they became difficult (Tr. 307, 311). Dr. Randleman administered the Woodcock-Johnson III Tests of Cognitive Ability ("WJ-III") and indicated J.B.S.'s standard score of 76 placed him in the low range of overall intellectual ability (Tr. 307, 309). Dr. Randleman found J.B.S.'s inductive reasoning, word knowledge and comprehension, visual-auditory learning and retrieval ability, and sight reading ability were mildly impaired; his automatic cognitive processing and spelling ability were mildly impaired to within normal limits; and his ability to recall details of complex stories and math calculation skills were normal (Tr. 308). He

indicated that J.B.S.'s academic skills were within the average range when compared to others his age (Tr. 314). Dr. Randleman diagnosed the claimant with unspecified disruptive, impulse control, and conduct disorder; ADHD; and persistent depressive disorder (dysthymia) (Tr. 315).

J.B.S. was initially placed on an Individualized Education Program ("IEP") on February 26, 2013 (first grade) (Tr. 207-11). His IEP showed his standard score of 82 on the WJ-III test administered in October 2012 placed him in the low average range of intellectual ability but his academic skills in sight reading, math calculation, and spelling were within normal limits (Tr. 202). It was determined that J.B.S. needed modifications in the classroom because his ADHD adversely affected his educational performance (Tr. 211). J.B.S.'s subsequent IEP in May 2015 (second grade) showed he was reading at a beginning of first grade level; his strengths were visual processing, fluid reasoning, letter-word identification, and calculation; and he was placed in a regular classroom with monitoring once per week for his reading, language arts, and math skills (Tr. 182-83). J.B.S.'s March 2016 IEP (third grade) showed he was reading at an end of second grade level, which was an improvement of more than a full grade level since the beginning of third grade (Tr. 407-15). J.B.S. was maintained in a regular classroom with forty minutes of direct instruction for basic reading skills every day (Tr. 410, 413).

In August 2015, J.B.S.'s second grade teacher Morgan Hooper completed a teacher questionnaire wherein she compared J.B.S.'s functioning to same-age, unimpaired children (Tr. 242-49). Ms. Hooper indicated that J.B.S. had no serious problems or very serious problems in any of the functional domains she assessed but had obvious problems or slight

problems in all of them except the domain of moving about and manipulating objects, where she identified no problems (Tr. 244-48). In the functional domain of acquiring and using information, Ms. Hooper indicated, *inter alia,* that J.B.S. had an obvious problem expressing ideas in written form, learning new material, and recalling and applying previously learned material, and a slight problem comprehending oral instructions and reading and comprehending written material (Tr. 243). She noted J.B.S. had a hard time focusing and staying awake, did not study at home, and often struggled in class (Tr. 243). In the domain of attending and completing tasks, Ms. Hooper indicated, *inter alia,* that J.B.S. had an obvious problem focusing long enough to finish assigned activities or tasks, completing class and homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time (Tr. 244). In the domain of interacting and relating with others, she indicated, *inter alia*, that J.B.S. had an obvious problem seeking attention appropriately, expressing anger appropriately, following rules, and respecting/obeying adults in authority; a slight problem making and keeping friends, asking permission appropriately, and relating experiences and telling stories; and no problem playing cooperatively with other children (Tr. 245). She specifically noted J.B.S.'s behavior and actions toward others varied based on the type of day he was having, and that when he had bad days, he would move to a different area in the room or go out in the hall to talk (Tr. 245). In the domain of caring for himself, Ms. Hooper indicated, *inter alia,* that J.B.S had an obvious problem handling frustration appropriately, responding appropriately to changes in his mood, and using appropriate coping skills to meet daily demands of school environment, and a slight problem being patient when necessary

(Tr. 247). As to J.B.S.'s health and physical well-being, Ms. Hooper noted he was calmer and much more cooperative after taking his medication (Tr. 248).

In September and October 2015, State agency medical consultants, Dr. Ron Cummings and Dr. Victoria Cook, reviewed the record and completed a Childhood Disability Evaluation Form (Tr. 69-71). They determined J.B.S. had a less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself; and no limitation in moving about and manipulating objects, and health and physical well-being (Tr. 69-70). Their opinions were affirmed on review (Tr. 80-82).

At step three in a childhood disability case, the ALJ must determine whether the child's impairment or combination of impairments medically equals or functionally equals the listings. *See Briggs v. Massanari,* 248 F.3d 1235, 1237 (10th Cir. 2001). If a child's impairment or combination of impairments does not meet or medically equal a listing, the ALJ must then determine whether the child's impairment functionally equals the listing, which means that the impairment (or combination of impairments) results in marked limitations in two domains of functioning or an extreme limitation in one domain of functioning. *See* 20 C.F.R. § 416.926a(a). These domains include: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1)(i)-(vi). When the ALJ determines there is a marked limitation in one of the six domains, he has found the limitation seriously interferes with the "ability to independently initiate, sustain, or complete activities." *Id.*

§ 416.926a(e)(2)(i). An extreme limitation interferes very seriously with a child's ability to do these things. *Id.* § 416.926a(e)(3)(i). Consideration of functional limitations includes information pertaining to functioning, such as reports of classroom performance, observations from others, or evidence of formal testing. *Id.* § 416.926a(e)(1)(i-ii).

In her written opinion, the ALJ determined that the claimant's impairments did not meet or medically equal Listings 112.04, 112.08, or 112.11. In making these findings, the ALJ found that J.B.S. was moderately limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself (Tr. 16). As part of her analysis of these medical equivalence domains, the ALJ noted generally that J.B.S was maintained on an outpatient basis with monthly medication management and some counseling, multiple mental status examinations remained largely unremarkable, and that his parent and/or guardian repeatedly commented about the effectiveness of medication (Tr. 16). She then summarized the evidence, including the claimant's testimony, Dr. Broadway's treatment notes, Dr. Randleman's consultative examination and standardized test results, Ms. Hooper's teacher questionnaire, and J.B.S.'s most recent IEP dated March 2016 (Tr. 18-21). She declined to give Dr. Randleman's opinions great weight, finding they were inconsistent with Dr. Broadway's treatment notes and J.B.S.'s IEP (Tr. 19). She then gave the state agency medical consultants' opinions diminished weight because they issued their opinions in compliance with regulations that were not in effect at the time of her decision but nonetheless incorporated their findings as to the claimant's domain-related limitations into her decision (Tr. 22-29). The ALJ then discussed the medical evidence with regard to each of the six

domains of functioning and concluded that J.B.S. did not functionally equal a listing because he did not have a marked limitation in two domains of functioning or an extreme limitation in one domain of functioning (Tr. 23-30).

The claimant first contends that J.B.S. meets or medically equals the requirements of Listing 112.05 for intellectual disorders and that the ALJ erred because she did not specifically mention or discuss this listing at step three. Listing 112.05 provides, in relevant part:

> B.  Satisfied by 1 and 2 (see 112.00H)
>
> 1.  Significantly subaverage general intellectual functioning evidence by a or b:
>
>     a.  A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>
>     b.  A full scale (or comparable) IQ score of 71-75 accompanied by a verbal performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
>
> 2.  Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
>     a. Understand, remember, or apply information (see 112.00E1); or
>
>     b. Interact with others (see 112.00E2); or
>
>     c. Concentrate, persist, or maintain pace (see 112.00E3); or
>
>     d. Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05 (effective March 27, 2017). In support of her argument that J.B.S. meets or medically equals Listing 112.05, the claimant references the results of the WJ-III test administered by Dr. Randleman in November 2014. Specifically, she asserts that J.B.S. meets or medically equals Listing 112.05(B)(1)(b) because there is a 95% probability that J.B.S's general intellectual standard score on the WJ-III would range from 71-81 and his verbal ability score would range from 64-84. However, the probability band the claimant refers to is not a report of J.B.S.'s November 2014 test results, rather it is merely an estimate of what he might be expected to score on future testing. His actual November 2014 test results reflect a general intellectual standard score of 76 and a verbal ability score of 74, both of which exceed the scoring requirements of Listing 112.05(B)(1)(b) (Tr. 309). Without satisfying the significantly subaverage general intellectual functioning requirement, the claimant is unable show that J.B.S. meets or medically equals Listing 112.05(B). As such, the claimant's remaining arguments concerning the second prong of Listing 112.05(B) have no effect on the Court's decision and the Court finds the ALJ did not err in failing to explicitly discuss Listing 112.05.

The claimant's remaining arguments relate to the ALJ's evaluation of J.B.S.'s scores on the WJ-III test administered by Dr. Randleman in November 2014. She asserts the ALJ engaged in improper "picking and choosing" by failing to discuss J.B.S.'s very low visual-auditory learning score when making her findings that J.B.S. did not meet or medically equal Listing 112.11 and did not functionally equal a listing. It is well-established that an ALJ may not "pick and choose among medical reports, using portions

of evidence favorable to h[er] position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004); *see also Carpenter v. Astrue,* 537 F.3d 1264, 1265 (10th Cir. 2008). On the other hand, the ALJ is not required to discuss in detail each piece of evidence in the record. *See Clifton*, 79 F.3d at 1009-10. ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."). In her decision, the ALJ specifically discussed J.B.S.'s WJ-III overall general intelligence score (which is derived from all subtest scores, including the visual-auditory learning score), his working memory score, and his academic skills score (Tr. 19). Additionally, the ALJ discussed and analyzed Dr. Randleman's opinions, which were based, in part, on J.B.S.'s WJ-III test results (Tr. 19). Thus, the ALJ clearly considered J.B.S.'s WJ-III test results and the Court finds no error.

Nonetheless, the claimant argues that J.B.S. has an extreme limitation in visual-auditory learning because his visual-auditory learning score on the WJ-III test was more than three standard deviations below the mean, and therefore the ALJ should have found he had at least a marked limitation in the medical equivalence domains of understanding, remembering, or applying information and interacting with others, and in the functional equivalence domains of acquiring and using information and attending and completing tasks. In support of her findings that the claimant was either moderately or less than markedly limited in the domains at issue, the ALJ relied on the effectiveness of medication in treating J.B.S.'s ADHD and behavior issues, Dr. Broadway's unremarkable mental status examinations, J.B.S.'s March 2016 IEP indicating "great benefit" from classroom modifications, and Ms. Hooper's teacher evaluation that found J.B.S. had no serious

-11-

problems or very serious problems in *any* of the functional domains (Tr. 16, 23-27). Furthermore, J.B.S.'s May 2015 IEP listed his visual processing and fluid reasoning as strengths, the state agency medical consultants found J.B.S. had no marked or extreme limitation in any of the functional domains, and Dr. Randleman indicated J.B.S.'s visual-auditory learning and retrieval ability was only mildly impaired and his visual motor integration skills were adequate (Tr. 69-71, 80-82, 183, 308-10). The Court thus finds that substantial evidence supports the ALJ's decision that J.B.S. had no marked or extreme limitations in any of the relevant domains. J.B.S.'s isolated very low score on a WJ-III subtest administered prior to achieving optimal medication management of his ADHD does not overcome this substantial evidence. The essence of the claimant's appeal is that the Court should reweigh the evidence and reach a different result, which the Court simply may not do. *See, e. g., Casias*, 933 F.2d at 800.

## Conclusion

In summary, the Court finds that correct legal standards were applied by the ALJ, and the decision of the Commissioner is therefore supported by substantial evidence. The decision of the Commissioner of the Social Security Administration is accordingly hereby AFFIRMED.

**DATED** this 25th day of September, 2019.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**